J-S13028-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DENISE C. BELKE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| STEPHEN W. BELKE | : | |
| | : | |
| Appellee | : | No. 1017 MDA 2021 |

Appeal from the Order Entered June 22, 2021
In the Court of Common Pleas of Berks County
Civil Division at No(s): 13-3879

BEFORE: STABILE, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.: **FILED SEPTEMBER 07, 2022**

Appellant, Denise C. Belke ("Ex-Wife"), appeals from the order entered in the Berks County Court of Common Pleas, which declined to enforce the provisions of the parties' post-nuptial agreement in this equitable distribution matter. We vacate and remand for further proceedings.

This Court has previously set forth some of the relevant facts and procedural history of this case as follows:

> This case has a long and torturous history made more complicated by [Appellee] Stephen W. Belke's ("Ex-Husband") living and working in Europe and his total lack of involvement in the latter stages of this litigation. The parties met in Virginia where Ex-Wife was a student at George Mason University and Ex-Husband was an officer in the United States Marine Corps. Ex-Husband earlier received a degree in chemical engineering from the University of Rochester. The parties married in March 1988

_____

[*] Former Justice specially assigned to the Superior Court.

and lived at various military installations. After Ex-Wife gave birth to the parties' first child, they decided that she would be a stay-at-home mother. She stopped working. Ex-Husband eventually left the armed services and took a job as an engineer with a company in Indiana. Ex-Husband was promoted to a series of management positions. After seven years, he left the company to become a production manager for ICI Paints in Berks County starting in the year 2000.

The parties purchased a home in Berks County but also lived for a time in Manhattan Beach, California where ICI had a plant. The parties ultimately returned to their home in Berks County. AkzoNobel purchased ICI Paints and for five years, Ex-Husband travelled back and forth from Berks County to AkzoNobel's plant in Cleveland.

In November 2007, Ex-Wife learned that Ex-Husband had been involved in extramarital affairs. When confronted by Ex-Wife, Ex-Husband admitted to the affairs and out of remorse suggested the parties enter into a post-nuptial agreement (the "Agreement"). The Agreement was drafted by Ex-Wife's counsel and the parties signed it on December 12, 2008. It provided, *inter alia*, that in the event [of] Ex-Husband's continued extramarital sexual activity, Ex-Wife would receive 100% of the marital assets and 60% of Ex-Husband's [present and future] income.

Subsequently, AkzoNobel provided Ex-Husband with an opportunity to work at their industrial coating division in Amsterdam, Netherlands. Ex-Husband accepted this offer and the parties leased an apartment in Amsterdam. Ex-Wife would visit Ex-Husband in Europe from time to time, but she primarily resided in Berks County. Ex-Husband periodically returned to the United States to spend time with Ex-Wife and go on family vacations. During this time, the parties engaged in serious arguments. The relationship between them was tumultuous and dysfunctional.

Ex-Husband eventually contacted Ex-Wife in February 2012 and told her he did not see a way forward for the parties' relationship and expressed a desire for a divorce. Ex-Husband then filed for divorce on May 2, 2012, but later withdrew this action nine months later. On March 20, 2013,

Ex-Wife filed the instant divorce action. On March 22, 2016, Ex-Husband filed a motion to bifurcate the divorce proceedings. Following a hearing, the trial court granted the motion on December 28, 2016. On the same day, the trial court decreed the parties divorced, but retained jurisdiction over all economic issues.

Following extensive hearings, the divorce master, on August 15, 2016, issued a report recommending that the trial court find the Agreement valid and that the marital estate be divided in accordance with the terms of the same. The parties stipulated before the divorce master that the Agreement was valid.

As of the date of the master's hearings, Ex-Wife resided part time in Pennsylvania and part time in California. Ex-Wife is employed as a flight attendant currently earning a gross income of approximately $40,000.00 per year.

Since October 2010, Ex-Husband has resided in the Netherlands, initially holding a position there with AkzoNobel. In 2014, his position with AkzoNobel ended, and he commenced his current position with Starbucks, N.A., in the Netherlands. Although Ex-Husband's income was in dispute, the trial court found that in 2012, he had a gross income, including wages and bonuses, of $454,594.00, and $94,599.00 in benefit income or perquisites, for a total income of $549,193.00. In 2013, Ex-Husband earned a total of $684,307.00, consisting of $450,050.00 in wage income and $234,257.00 in benefit income. For 2014, his aggregate income was $870,1236.00, consisting of $644,685.00 in wages and $225,438.00 in benefit income. In 2015, his total income was $655,613.00, consisting of $511,957.00 in wages and $143,656.00 in benefits. Ex-Husband was subject to a 36 percent tax rate on all income.

Upon receiving the master's report, the parties' filed exceptions.

\*　　\*　　\*

By an opinion dated August 11, 2017 and filed on August 14, 2017, the trial court *sua sponte* determined that the Agreement was invalid, and thus unenforceable. As a result,

the trial court dismissed the parties' exceptions and remanded the case to the divorce master for further proceedings. On August 30, 2017, Ex-Wife filed a petition for certification of interlocutory appeal regarding the August 14, 2017 order. On September 7, 2017, the trial court certified the order. The following day, Ex-Wife appealed to this Court (140[9] MDA 2017). On December 16, 2017, based on Ex-Husband's application, we quashed as interlocutory Ex-Wife's appeal.

On April 4, 2018, Ex-Husband's counsel withdrew her appearance and Ex-Husband entered his appearance *pro se*. Thereafter, and continuing to (at least) October 31, 2019, Ex-Husband took no part in these proceedings.

\* \* \*

The divorce master's hearing on remand was held on September 27, 2018 with Ex-Wife being the only witness. On April 13, 2019, the divorce master filed his report and recommendation and proposed divorce decree. The master recommended distributing 70% of marital assets to Ex-Wife and 30% to Ex-Husband, assets being defined according to 23 Pa.C.S.A. § 3501. The master further recommended Ex-Husband pay alimony to Ex-Wife in the amount of $11,000.00 per month for 8 years, that each party is responsible for their own debts and obligations and that each party retain items of personalty titled in his or her name or in the party's possession. Finally, the master recommended Ex-Husband pay 60% of Ex-Wife's attorney's fees.

On April 23, 2019, Ex-Wife filed 16 exceptions to the master's report…. On October 31, 2019, the trial court issued an order, granting in part and denying in part Ex-Wife's exceptions. Moreover, consistent with the master's recommendation, the trial court decreed, among other things, that: (1) Ex-Wife shall receive 70% ($574,377.51) of the marital assets valued at $820,482.15; (2) Ex-Husband shall pay to Ex-Wife $11,000.00 per month in alimony for 8 years; and (3) the parties shall be responsible for their own debts and obligations. In support of its October 31 order, the trial court filed a detailed opinion, wherein it also incorporated its opinion dated August 14,

- 4 -

2017, as amended by its September 7, 2017 order. Thereafter, Ex-Wife appealed from the September 7, 2017 order, which we previously had declared interlocutory when we quashed her appeal, and the…October 31, 2019 order. The trial court did not direct her to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

***Belke v. Belke***, No. 1933 MDA 2019, unpublished memorandum at 2-9 (Pa.Super. filed Feb. 19, 2021) (internal footnotes and emphasis omitted).

On appeal from the October 31, 2019 order, Ex-Wife argued the court erred in *sua sponte* questioning the validity of the Agreement and declaring the Agreement void and unenforceable. On February 19, 2021, this Court agreed with Ex-Wife and held that "the trial court erred when it, *sua sponte*, declared the Agreement void and unenforceable, despite the parties stipulating to its validity before the master in 2016." ***Id.*** at 12-13. Therefore, this Court remanded the matter for the trial court to decide the parties' exceptions filed from the August 15, 2016 master's report. This Court expressly directed the court to consider on remand whether Ex-Wife was barred from claiming that the parties had separated after August 2011, based on a statement Ex-Wife had made in a support action involving the parties indicating the date of separation as August 2011. ***Id.*** at 6 n.6. This Court further instructed that "upon determining which provision, if any, of the Agreement applies to this case, the trial court is directed to remand the matter to the master for further proceedings for purposes of distributing marital assets." ***Id.*** at 14.

Upon remand, the court declined to hold additional proceedings,

deeming the existing record sufficient for the court to resolve the matter. (*See* Decision and Order, filed 6/22/21, at 6 n.3). Based on the record before it, the court decided that the purpose of the Agreement was to preserve the marriage; once the parties separated, the purpose no longer existed and there would no longer be any benefit of the bargain to either party. (*See id.* at 12). Thus, the court held "that enforcement of the [A]greement for a breach of subsection 1, 'illicit acts' would require Ex-Wife to establish that any illicit acts committed by Ex-Husband occurred prior to the date of separation." (*Id.* at 12-13). The court then observed the master's finding that Ex-Husband began an intimate relationship with a woman in Amsterdam, Ms. Jordan, in early 2012. According to Ex-Husband, however, a sexual relationship did not develop until May or June 2012. (*Id.* at 13).

Regarding the date of separation, the court noted the master's finding that Ex-Husband informed Ex-Wife of his intent to separate in February 2012. (*Id.*) Nevertheless, the court emphasized Ex-Husband's assertion that the parties separated in August 2011, when Ex-Wife last cohabitated with Ex-Husband in Amsterdam. Significantly, the court relied on Ex-Wife's statement in a support complaint that she had filed against Ex-Husband on March 20, 2013, indicating the date of separation was August 2011. The court disagreed with the master's conclusion that Ex-Wife's statement in the support complaint did not constitute a judicial admission. (*Id.* at 15). Instead, the court held that Ex-Wife's statement in the support complaint was a judicial admission,

made for Ex-Wife's benefit in the support action, of which the court could take judicial notice. (**Id.**)

The court further found that using August 2011 as the date of separation was not inconsistent with other evidence presented in the divorce action. (**Id.** at 16). The court acknowledged that the parties took vacations together and celebrated holidays together after August 2011, but it indicated that parties who have separated sometimes continue to function as a family unit for similar purposes. (**Id.**) The court also acknowledged that Ex-Wife had amended the date of separation in the support action on March 5, 2014, from August 2011 to May 2012, consistent with the date that Ex-Husband filed the divorce complaint. Nevertheless, the court decided that "the amendment was not made to serve the context of the support action at all but was filed as a self-serving document to enhance Ex-Wife's position in the divorce, while having no effect in the support action." (**Id.** at 17). Consequently, the court held Ex-Wife was bound by the August 2011 admission and the amendment lacked any force or effect. (**Id.**) Because Ex-Husband's relationship with Ms. Jordan commenced after the date the court decided the parties had separated, it held that Ex-Husband did not breach the "illicit acts" provision of the Agreement. (**Id.**)

Additionally, the court considered whether Ex-Husband had breached a different provision of the Agreement (the "divorce" provision) by "seeking" a divorce from Ex-Wife after the date of the Agreement. Although the court

acknowledged that Ex-Husband sought a divorce when he filed a divorce complaint in May 2012 (which he later withdrew in 2013), the court noted that Ex-Wife's counsel wrote a letter to Ex-Husband's counsel immediately preceding the filing of the divorce action asking Ex-Husband to initiate the divorce proceedings. The court decided that Ex-Wife's "change of position acts as a waiver" of the "divorce" subsection of the Agreement. Thus, the court held that Ex-Husband's filing of a divorce complaint in May 2012 did not run afoul of the Agreement. (*Id.* at 19). Moreover, the court held that a clause prohibiting a party from filing a divorce complaint at any time in the future is improper, unenforceable, and against public policy. (*Id.*).

In sum, the court decided that Ex-Husband was not subject to any penalties arising out of a breach of the Agreement, and that the Agreement should not be enforced in equitably distributing the marital estate. Rather, the court determined that equitable distribution should be governed by the terms and conditions of the Divorce Code. (*Id.* at 19-20). By order entered June 22, 2021, the court reinstated the equitable distribution scheme as previously set forth in the October 31, 2019 order, such that Ex-Wife would be awarded 70% of the marital assets and Ex-Husband would be awarded 30% of the marital assets. The court valued the marital assets at $820,482.15, with Ex-Wife to receive $574,337.51. The court further directed Ex-Husband to pay Ex-Wife alimony in the amount of $11,000.00/month for eight years. (*See* Equitable Distribution Decree, June 22, 2021, at 1).

Ex-Wife timely filed a notice of appeal on July 20, 2022. The court did not order, and Ex-Wife did not file, a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b).

Ex-Wife raises the following issues for our review:

> Whether the trial court erred by failing to comply with the directions of the Pennsylvania Superior Court in the order of the Pennsylvania Superior Court filed on February 19, 2021, remanding this matter to the trial court….

> Whether the trial court erred, even if it is determined that the trial court has complied with the directions of the Pennsylvania Superior Court…filed February 19, 2021….

(Ex-Wife's Brief at 29-30) (sub-issues omitted).[1]

Ex-Wife combines her issues in the argument section of her brief, and we will do the same for purposes of disposition. (**See id.** at 61). Ex-Wife initially argues that the court did not fully adhere to the remand instructions from this Court's prior decision. Ex-Wife asserts that this Court expressly directed the trial court to decide the parties' exceptions to the master's report. Ex-Wife contends the court ignored this directive, determined that the operative provisions of the Agreement were inapplicable, and reinstated its prior October 31, 2019 order.

Ex-Wife also argues the court erred in finding that the "illicit acts" provision of the Agreement was inapplicable/unenforceable. First, Ex-Wife challenges the court's decision that for Ex-Husband to have breached the

---

[1] Ex-Husband has not filed a responsive brief on appeal.

Agreement, he must have committed an illicit act before the parties' separation. Ex-Wife emphasizes that the Agreement does not include any time limit for the commission of illicit acts by Ex-Husband. Rather, Ex-Wife maintains the Agreement prohibited Ex-Husband from engaging in illicit acts "at any time after the date of this Agreement." (*Id.* at 69). Ex-Wife claims the court lacked authority to revise any portion of the Agreement in a way that ran counter to what the parties intended when the contract was executed.

Second, Ex-Wife argues the court erred in using August 2011 as the date of the parties' separation. Ex-Wife highlights testimony from various witnesses at the divorce master's hearings demonstrating that the parties were still together through January 2012. Although the parties lived in separate residences after August 2011, Ex-Wife points to testimony showing that the parties vacationed in Rome together in August 2011, hosted a Christmas party at their home in December 2011, and vacationed together in Hawaii in early January 2012 during which they were publicly affectionate. Ex-Wife emphasizes testimony from her daughter, Brooke Belke, supporting Ex-Wife's assertion that it was not until the end of February 2012 that Ex-Husband informed Ex-Wife he wanted a divorce. Ex-Wife further contends that she did not pack all her belongings when she left Amsterdam in August 2011, as she had planned to return there prior to Christmas 2011. Ex-Wife suggests that Ex-Husband's testimony regarding the date of separation and date of his relationship with Ms. Jordan is incredible, particularly where Ex-

Husband claimed he did not begin a sexual relationship with Ms. Jordan until May or June 2012 but admitted that Ms. Jordan was his girlfriend as of March 2012. Ex-Wife insists that it is clear from the testimony of multiple witnesses that Ex-Husband did not make his intent to end the marriage clear to Ex-Wife until February 2012.

Ex-Wife also argues the court erred in precluding her from disputing August 2011 as the date of separation based on a prior statement in the support action. Ex-Wife asserts that a date of separation used in a complaint for support has no bearing on equitable distribution. Ex-Wife reiterates that the testimony at the divorce master's hearings clearly established that Ex-Husband's relationship with Ms. Jordan began prior to the parties' separation.

Further, Ex-Wife argues the court erred in finding that the "divorce" provision of the Agreement was inapplicable or unenforceable. Ex-Wife stresses that the relevant provision of the Agreement is triggered if Ex-Husband seeks a divorce from Ex-Wife "at any time after the date of this Agreement **for any reason**." (*Id.* at 83) (emphasis in Ex-Wife's brief). Ex-Wife contends the Agreement did not include an exception to this provision if Ex-Husband sought a divorce at the request/invitation of Ex-Wife. Ex-Wife complains the court essentially revised the language of the Agreement to conform with the court's "notions of fairness," counter to what the parties intended when the contract was signed. Moreover, Ex-Wife submits there is no provision in the Agreement which imposes any time limit for Ex-Husband

to seek a divorce from Ex-Wife. Ex-Wife contends the court completely ignored the request for a divorce that Ex-Husband filed in May 2012, which Ex-Wife contends is a breach of the Agreement.

Finally, Ex-Wife avers the court erred by *sua sponte* concluding that the "divorce" provision of the Agreement is unenforceable as against public policy. Ex-Wife stresses that Ex-Husband never challenged the validity of the "divorce" clause on public policy grounds. Ex-Wife emphasizes that this Court has already reversed the court for *sua sponte* deciding the Agreement is against public policy. Ex-Wife concludes the court erred by failing to apply the parties' Agreement to this equitable distribution matter, and this Court must grant relief.[2] We agree relief is due.

At the outset, we observe: "The determination of marital property rights through prenuptial, postnuptial and settlement agreements has long been permitted, and even encouraged. Both prenuptial and post-nuptial agreements are contracts and are governed by contract law." *Holz v. Holz*,

_____

[2] In her conclusion, Ex-Wife asks this Court to reverse and remand "with instructions to the trial judge to recuse himself in further proceedings and for the case to be re-assigned to another judge of the court of Common Pleas of Berks County." (*Id.* at 91). Nevertheless, Ex-Wife did not seek recusal before the trial court prior to the instant appeal, so we will not consider her belated request at this juncture. *See Lewis v. Lewis*, 234 A.3d 706, 721 (Pa.Super. 2020) (holding husband waived claims of court's implicit bias in case where he did not seek trial court's recusal prior to appeal). We note, however, that Ex-Wife filed a recusal motion on January 23, 2017, which the court denied on May 23, 2017. The court's denial of the 2017 recusal motion is not before us at this time.

- 12 -

850 A.2d 751, 757 (Pa.Super. 2004) (internal citations omitted), *appeal denied*, 582 Pa. 700, 871 A.2d 192 (2005). "In determining whether the trial court properly applied contract principles, the reviewing Court must decide, based on all the evidence, whether the trial court committed an error of law or abuse of discretion." *Lewis, supra* at 711. An abuse of discretion

> is synonymous with a failure to exercise a sound, reasonable, and legal discretion. It is a strict legal term indicating that an appellate court is of the opinion that there was commission of an error of law by the trial court. It does not imply intentional wrong or bad faith, or misconduct, nor any reflection on the judge but means the clearly erroneous conclusion and judgment—one that is clearly against logic and the effect of such facts as are presented in support of the application or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing; an improvident exercise of discretion; an error of law.

*Id.* "To the extent we must decide a question of law…our standard of review is *de novo*, and our scope of review is plenary." *Id.*

Additionally:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. **The whole instrument must be taken together in arriving at contractual intent.** Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.
>
> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it

- 13 -

is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Ramalingam v. Keller Williams Realty Grp., Inc.*, 121 A.3d 1034, 1046 (Pa.Super. 2015) (emphasis added in part and omitted in part). "Further, absent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements." *Stackhouse v. Zaretsky*, 900 A.2d 383, 386 (Pa.Super. 2006), *appeal denied*, 590 Pa. 669, 912 A.2d 838 (2006).

Regarding remand directives from this Court:

The issue of whether a trial court properly interpreted the scope of a remand order is a matter of law. As in all appeals raising matters of law, our standard of review is *de novo*, and our scope of review is plenary.

A trial court has an obligation to comply scrupulously, meticulously, and completely with an order of [the appellate court] remanding a case to the trial court. The trial court is required to strictly comply with the mandate of the appellate court. Issues not included in the mandate cannot be considered by the trial court.

*Carmen Enterprises, Inc. v. Murpenter, LLC*, 185 A.3d 380, 389 (Pa.Super. 2018), *appeal denied*, 650 Pa. 671, 201 A.3d 725 (2019) (internal citations, quotation marks, and emphasis omitted).

Instantly, we address Ex-Wife's first complaint that the court failed to comply with this Court's remand decision, by declining to address all of the

parties' exceptions to the August 15, 2016 master's report. In this Court's February 19, 2021 disposition, we stated:

> Accordingly, we remand this matter to the trial court with direction to decide the parties' exceptions filed in connection with the August 15, 2016 master's report. Furthermore, upon determining which provision, if any, of the Agreement applies to this case, the trial court is directed to remand the matter to the master for further proceedings for purposes of distributing marital assets.

**Belke, supra** at 14.

Here, the crux of the parties' exceptions focused on whether any provision of the Agreement applied such that it should govern the parties' equitable distribution scheme. In the face of this Court's decision that the trial court had no authority to *sua sponte* decide the Agreement was wholly invalid, upon remand, the court evaluated the existing record to decide whether the "illicit acts" or "divorce" clauses of the Agreement applied. Although the court's June 22, 2021 order did not expressly delineate a finding on each party's specific exception to the master's report, the court's decision analyzed the exceptions in a global manner in making its ultimate determination that neither the "illicit acts" nor the "divorce" clause applied to trigger enforcement of the Agreement. Essentially, the court's decision that the Agreement did not apply resolved Ex-Wife's exceptions to the master's report and either resolved or rendered moot Ex-Husband's exceptions. Thus, we disagree with Ex-Wife's contention that the court failed to comply with our remand directive. **See Carmen Enterprises, supra**.

Turning to whether any provision of the Agreement applied to this case, we must analyze the language of the parties' Agreement, which provides, in relevant part, as follows:[3]

> WHEREAS, the parties were marred on March 19, 1998; and
>
> WHEREAS, on November 21, 2007, at approximately 2:30 a.m., Wife received a phone call from a man…informing Wife that Husband had just engaged in phone sex with [his] pregnant girlfriend…, a co-worker of Husband, whom Husband had been having an extra-marital affair with since September 18, 2006; and
>
> WHEREAS, in May of 2008, Husband finally confessed to a faithless and degraded course of conduct that he had been involved in for over two (2) years including, but was not limited to: an extra-marital affair…; hiring escorts and prostitutes; frequent trips to strip clubs; engaging in phone sex with over one hundred (100) different women; spending long hours trolling, downloading and consuming online pornography and pornography through other mediums, including magazines and videos ("Illicit Acts"); and
>
> WHEREAS, Wife has lost faith in what she believed to be a happy twenty (20) plus year marriage, has now been subjected to the horrors of worrying about having received, or receiving in the future, sexually transmitted diseases, and is unsure Husband is able to stop engaging in Illicit Acts; and
>
> WHEREAS, Husband has subsequently been diagnosed as having a sex addiction by two (2) different psychologists and was as of the date of this Agreement under the treatment of both and attached hereto as Exhibit "C" are affidavits from both said treating psychologists that Husband is competent to enter into this Agreement; and

---

[3] As the parties were still married when they executed this Agreement, we will retain using the designations "Husband" and "Wife" as set forth in the Agreement and will not change those designations to "Ex-Husband" and "Ex-Wife" as we do elsewhere in this disposition.

WHEREAS, because Husband appears remorseful for his actions and does not want Wife to leave or divorce him, it was Husband's idea and desire to enter into a postnuptial agreement for the protection of Wife and his consideration for her remaining married to him; and

WHEREAS, the parties have furnished to each other financial disclosures, receipt of which the parties hereby acknowledge copies of which are attached hereto as Exhibit "A" ("Husband's Assets") and Exhibit "B" ("Wife Assets") (Husband's Assets and Wife's Assets are sometimes hereinafter collectively referred to as the "Assets") specifically incorporated herein by reference; and

WHEREAS, Wife has had the advice of counsel…, and Husband has been advised to retain separate independent counsel, understands the importance of separate counsel, has had the opportunity to retain separate counsel and has knowingly declined to do so; and

NOW, THEREFORE, INTENDING TO BE LEGALLY BOUND, the parties agree as follows:

## I.     ILLICIT ACTS

1. If Husband engages in any Illicit Act or any other sexually deviant acts, including but not limited to, visiting massage parlors, having online [sex] through chat rooms or engaging in same sex acts or other same sex relations, **at any time after the date of this Agreement** and Wife seeks a divorce as a result:

(a) Wife shall receive the Assets as well as any assets acquired by Husband and Wife after the date of this Agreement, whether real or personal property, wherever located, free and clear of any liability, encumbrance, or accompanying debt;

(b) Wife shall receive the greater of: (i) sixty percent (60%) of all Husband's present and future income, including but not limited to income from salary, bonuses, and stock options; or (ii) One Hundred Thousand Dollars ($100,000) per year until the earlier of Wife's or Husband's death; and

(c) Husband shall designate Wife as the sole beneficiary and shall not remove her from any of Husband's retirement accounts and/or life insurance policies either those in existence as of the date of this Agreement or those acquired or created after the date of this Agreement.

## II. DIVORCE

2. **If Husband seeks a divorce from Wife at any time after the date of this Agreement for any reason**:

(a) The parties agree to have the herein Agreement incorporated but not merged into any divorce order entered by any court of competent jurisdiction and the entry of any order deemed necessary by the court to secure the performance of the terms and conditions of the herein Agreement.  It is further agreed by the parties that the herein Agreement shall be incorporated, but shall not merge, into the aforesaid decree of divorce;

(b) Wife shall receive the Assets as well as any assets acquired by Husband or Wife after the date of this Agreement, whether real or personal property, wherever located, free and clear of any liability, encumbrance, or accompanying debt;

(c) Wife shall receive sixty percent (60%) of all Husband's present and future income, from whatever source derived, including but not limited to income from salary, bonuses, and stock options, but such amount shall not be less than one Hundred Thousand Dollars ($100,000) per year;

(d) Husband shall designate Wife as sole beneficiary and shall not remove her from Husband's retirement accounts and life insurance policies; and

(e) Husband shall pay all Wife's legal fees and costs of court in connection with the divorce proceeding.

3. If Wife seeks a divorce from Husband, not as a result of an Illicit Act of Husband after the date of this Agreement:

(a)  Nothing  in  this  Agreement  shall  prevent  Wife  from

> seeking a divorce from Husband for any reason. In such case, the parties agree that this Agreement shall not be used to determine, limit or relieve the rights and/or obligations of either party with respect to spousal support, maintenance, alimony [*pendente lite*], alimony, counsel fees or costs or any other payments of a similar nature to which he or she, in the absence of this Agreement might be entitled to by statute, including rights arising pursuant to the Divorce Code of 1980, as amended, or any similar laws of any jurisdiction which may be applicable now or at any future time.

(Agreement, 12/12/08, at 1-3; R.R. at 43-44) (emphasis added).

Here, both the master and the court rejected Ex-Wife's argument that the date of separation was irrelevant to applicability of the Agreement due to the language in the Agreement prohibiting Ex-Husband from engaging in "illicit acts" "at any time after the date of this Agreement." In rejecting this argument, the master decided the terms of the Agreement no longer bound Ex-Husband after the parties separated, citing *Laudig v. Laudig*, 624 A.2d 651 (Pa.Super. 1993).

In *Laudig*, the parties married in 1972. In 1987, husband discovered that wife was having an extramarital affair. The parties separated, and wife moved out of the marital home. During the separation, husband told wife that he contemplated divorcing her. On August 3, 1987, however, the parties reconciled and wife moved back into the marital home. Husband then asked wife to execute a post-nuptial agreement which would limit her marital property rights if she had another extramarital affair.

The parties executed a post-nuptial agreement on August 17, 1987,

which limited wife's marital property rights if she engaged in sexual intercourse with anyone other than husband within 15 years, while the two were married and living together. In 1988, wife resumed a relationship with her former paramour. Husband thereafter filed for divorce and sought to enforce the parties' agreement regarding equitable distribution. Both the master and the court upheld the agreement. Wife appealed, claiming, *inter alia*, "that the post-nuptial agreement [did] not operate to preclude her statutory rights in the event of divorce; it merely provide[d] for the transfer of certain property interests in the event infidelity occurs." ***Id.*** at 653.

On appeal, this Court flatly rejected wife's argument:

> The parties' intent, as expressed in their post-nuptial agreement in this case, is clear. Husband and wife contractually agreed to dispose of their marital property in a specified manner in the event of infidelity on wife's part. Although the contract language does not specifically address a divorce proceeding, the intent to preclude any other equitable distribution becomes clear when the contract is construed as a whole. Paragraph seven of the agreement specifically provides that should other marital misconduct occur, "the normal divorce laws and settlement procedures would apply, including the standards setting forth equitable division of marital property, alimony and the like."
>
> Construing the contract as a whole, it is clear that the parties presumed wife's infidelity would lead to a divorce. Recognizing this, the parties entered into the post-nuptial agreement to limit wife's right to participate in the distribution of marital property if the divorce followed wife's repeated infidelity. If the parties did not contemplate a divorce action in the event of such infidelity, the reference to divorce procedures in paragraph seven is meaningless. One portion of an agreement cannot be interpreted so as to annul another part.

> The record supports this construction as well. Husband testified that the purpose of the agreement was to limit the assets which wife would receive in the event she resumed her adulterous conduct. This intent comes through quite clearly. Paragraph seven indicates that the parties were cognizant of the fact that equitable distribution would occur in a divorce action, and, in the event of a divorce where there had been no infidelity by wife, normal distribution of marital property would be made.
>
> [Wife] argues that since the contract language does not specifically address property rights in the event of divorce, the provisions of the agreement do not apply. Under appellant's interpretation, the occurrence of infidelity would require wife to transfer all of her rights to the marital property to husband in exchange for a lump sum of money, and upon the subsequent filing of a divorce action, the property subject to the prior transfer would then be redistributed according to the Divorce Code. Such an interpretation flies in the face of basic contract law and undermines the validity of marital agreements. Not only is such a construction contrary to the intent of the parties, but the result is absurd.

*Id.* at 653-54 (internal citation and footnote omitted).

Here, the master relied on ***Laudig*** when assessing the intent of the parties in drafting the Agreement. The master found the purpose of the Agreement was to protect Ex-Wife's property rights in the event the parties separated or divorced; and to protect Ex-Wife from contracting a sexually transmitted disease. Consequently, the master deemed it contrary to the intent of the parties and unreasonable to extend the "illicit acts" provision beyond the date of separation. The court agreed with the master's finding in this respect. (***See*** Decision and Order at 12-13) (stating: "this Court holds that enforcement of the agreement for a breach of subsection 1, 'illicit acts'

would require Ex-Wife to establish that any illicit acts committed by Ex-Husband occurred prior to the date of separation").

We agree with the master and the court that Ex-Husband must have committed "illicit acts" prior to the parties' separation for the Agreement to apply. Although Ex-Wife relies on the language in the Agreement penalizing Ex-Husband if he engaged in "illicit acts" "at any time after the date of this Agreement," the various "WHEREAS" clauses introducing the Agreement confirm the parties' intent to provide economic protection for Ex-Wife if Ex-Husband engaged in "illicit acts" while the parties were still together. For example, if the parties agreed to separate and then Ex-Husband engaged in "illicit acts," Ex-Wife would no longer have to worry about contracting a sexually transmitted disease. Further, the "illicit act" at issue is Ex-Husband having an affair with Ms. Jordan. If the parties had already separated before Ex-Husband had an affair, his alleged offensive conduct would not be considered an "illicit act." Read as a whole, the intent of the parties' Agreement was to protect Ex-Wife **if** Ex-Husband engaged in "illicit acts" **before** the parties' separation. ***See Laudig, supra***. ***See also Ramalingam, supra***.

Next, the master decided the date of the parties' separation was February 2012. The master found, *inter alia*, that: (1) in August 2011, the parties took a vacation to Rome together; at that time, Ex-Husband did not indicate that he wanted a divorce; Ex-Wife stated the parties had a nice

vacation acting as a normal couple; (2) Ex-Wife took real estate classes in September 2011, with the encouragement of Ex-Husband, which Ex-Wife completed in November 2011; there was no discussion regarding divorce proceedings at that time; (3) the parties and their children spent Thanksgiving and Christmas in 2011 at the Berks County marital residence; (4) in October 2011, Ex-Husband returned to the United States for one week; the parties had sexual intercourse during this visit; (5) in late 2011, Ex-Husband began to make plans for the family to go to Hawaii immediately after the Christmas holiday; (6) the parties ultimately went on the family vacation to Hawaii in early January 2012, appeared to be getting along, and were publicly affectionate with one another; and (7) the parties discussed retiring to Hawaii in the future to the idyllic nature of the islands. (**See** Master's Report and Recommendation, 8/15/16, at ¶¶ 43-67; R.R. at 112-114).

Additionally, the master found Ex-Husband did not contact Ex-Wife until February 2012 to indicate that he did not see a way forward with the parties' relationship and that he wanted a divorce. (**Id.** at ¶ 76; R.R. at 115). In late February 2012, Ex-Husband also called his daughters to let them know of his intent to obtain a divorce from Ex-Wife. (**Id.** at ¶ 106; R.R. at 117).

The master further found that Ex-Husband met Ms. Jordan on January 12, 2012 in the Amsterdam airport. (**Id.** at ¶ 72; R.R. at 114). The master acknowledged that Ex-Husband stated his sexual relationship with Ms. Jordan did not begin until May or June 2012. (**Id.** at ¶ 74; R.R. at 114). Nevertheless,

in late February or early March 2012, Ex-Wife went to Amsterdam and discovered a woman was staying with Ex-Husband at the Amsterdam apartment based on numerous female items in the home that did not belong to Ex-Wife. (*Id.* at ¶ 78-82; R.R. at 115). Ex-Wife also discovered cards written to Ex-Husband by Ms. Jordan (which Ex-Wife read and which were admitted into evidence at the hearing) that demonstrated more than a casual relationship. (*Id.* at ¶ 84, 98; R.R. at 115-116). Based upon the foregoing, the master concluded Ex-Husband had engaged in "illicit acts" as defined in the Agreement by having an extramarital affair before the parties had separated, such that the Agreement should govern equitable distribution of the parties' assets.

The court, on the other hand, decided August 2011 was the date of the parties' separation based on Ex-Wife's statement in support proceedings regarding these parties.[4] Thus, the court opined Ex-Wife's statement was a "judicial admission" of which the court could take judicial notice, reasoning:

> This [c]ourt finds that the admission is clear and unequivocal. Further, as part of the support complaint, the statement made by Ex-Wife was for her benefit, and for her right to proceed in the support action. Accordingly, the admission by Ex-Wife in the support complaint constitutes a judicial admission, is binding, and therefore cannot be contradicted by Ex-Wife as the admitting party.
>
> We also note that the date of August 2011 is not inconsistent with the other evidence presented in the divorce action. In

[4] The statement set forth in paragraph 3(b) of the support complaint reads, "[The parties] were separated on 8/2011." (Decision and Order at 15 n.5).

- 24 -

support of his finding of the February 2012 separation date, the Master noted that the parties continued to function as a family until 2012, and there was financial interdependence, including the filing of joint tax returns and the maintenance of the jointly owned residence. They went on several vacations together in the summer of 2011 and December 2011, including a trip to Hawaii. They celebrated Thanksgiving and Christmas in 2011 at the family home in Berks County. They also continued to have sexual relations. While this evidence is consistent with the Master's finding of a February 2012 separation date, the evidence as a whole also supports the August 2011 date. As stated, the parties maintained separate residences from August 2011, with Ex-Wife in Berks County and Ex-Husband in Amsterdam, and with Ex-Wife declining to renew her residency permit in the Netherlands. The fact that the parties took vacations together and celebrated Thanksgiving and Christmas together as a family is not support for or against cohabitation. Parties who have separated sometimes do continue to function as a family unit for these purposes, particularly when there are children involved as is here. We also note that sexual relations alone are insufficient to support a finding that the parties have not separated.

We must also address the fact that Ex-Wife, through counsel, amended the judicial admission in the support complaint, changing the date of separation from August 2011 to May 2012, consistent with the date Ex-Husband filed the divorce complaint. This amendment was made on March 5, 2014, approximately thirteen (13) months after the support action was filed and processed. This [c]ourt finds that the amendment was not made to serve the context of the support action at all but was filed as a self-serving document to enhance Ex-Wife's position in the divorce, while having no effect in the support action. We note that there are no facts in the record to support a May 2012 separation date apparently simply being chosen because of the divorce filing date. This [c]ourt finds that Ex-Wife is bound by the August 2011 admission and that the amendment is without any force and effect.

Accordingly, this [c]ourt finds that the date of separation of the parties is August 2011. Further, the commencement of the relationship between Ex-Husband and [Ms.] Jordan

commenced, at the earliest in January 2012, post separation. As the relationship between Ex-Husband and Ms. Jordan therefore does not fall under the definition of "illicit act" as defined under the agreement and as there is no other evidence of any other illicit acts committed by Ex-Husband, this [c]ourt finds that Ex-Husband did not breach the agreement on the basis of committing an illicit act.

(Decision and Order at 15-17) (internal footnote and citation omitted). For the following reasons, we cannot agree with the court's analysis.

This Court has explained:

Statements of fact by one party in pleadings, stipulations, testimony, and the like, made for that party's benefit, are termed judicial admissions and are binding on the party. **Nasim v. Shamrock Welding Supply Co.**, [563 A.2d 1266, 1267 (Pa.Super. 1989)] ("It is well established that a judicial admission is an express waiver made in court or preparatory to trial by a party or his attorney, conceding for the purposes of trial, the truth of the admission."). As we held in **John B. Conomos, Inc. v. Sun Co.**, 831 A.2d 696, 712 (Pa.Super. 2003)[, *appeal denied*, 577 Pa. 697, 845 A.2d 818 (2004)],

> For an averment to qualify as a judicial admission, however, it must be a clear and unequivocal admission of fact. Judicial admissions are limited in scope to factual matters otherwise requiring evidentiary proof, and are exclusive of legal theories and conclusions of law. The fact must have been unequivocally admitted and not be merely one interpretation of the statement that is purported to be a judicial admission. **Jones v. Constantino**, [631 A.2d 1289, 1293–94 (Pa.Super.1993)] (finding no admission where "the evidence could be reasonably construed to admit of more than one meaning")…. An admission is not conclusively binding when the statement is indeterminate, inconsistent, or ambiguous. When there is uncertainty surrounding a conceded fact, it is the role of the judge or jury as fact finder to determine which facts have been adequately proved and which must be rejected.

*Coleman v. Wyeth Pharmaceuticals, Inc.*, 6 A.3d 502, 524-25 (Pa.Super. 2018), *appeal denied*, 611 Pa. 638, 24 A.3d 361 (2011) (some internal citations omitted).

"[Judicial] admissions are considered conclusive **in the cause of action in which they are made**—and any appeals thereof—and the opposing party need not offer further evidence to prove the fact admitted." ***John B. Conomos, Inc., supra*** at 713 (internal citation omitted) (emphasis added). Thus, for an averment to constitute a judicial admission:

> First, the averment must be made in a verified pleading, stipulation, or similar document. **Second, the averment must be made in the same case in which the opposing party seeks to rely upon it. In other words, an averment made in a pleading in an unrelated cause is not a judicial admission that precludes a party from contradicting that averment**. Third, the averment must relate to a fact and not a legal conclusion. Fourth, the averment must be advantageous to the party who made it. Finally, the fact must be plausible.

*Branton v. Nicholas Meat, LLC*, 159 A.3d 540, 557 (Pa.Super. 2017) (internal footnote omitted).

Here, Ex-Wife stated in a support complaint against Ex-Husband that the parties separated in August 2011. Even if we agreed with the court's analysis that Ex-Wife's subsequent amendment to that pleading had no force or effect, Ex-Wife's statement in a **different** cause of action than the one at issue does not constitute a judicial admission. *See id.* The support action in which Ex-Wife made the alleged judicial admission and the divorce action

currently before us are not one and the same.[5]  ***See, e.g., Wellner v. Wellner***, 699 A.2d 1278, 1281 (Pa.Super. 1997) (explaining that determination made in support order that parties were separated in 1979 does not have same legal significance as determination of final date of separation rendered during equitable distribution).  Therefore, we cannot agree with the court that Ex-Wife is precluded from offering a different date of the parties' separation than August 2011 based on the theory of a judicial admission.  ***Id.***

Further, the court did not dispute the master's findings that up until February 2012, the parties had vacationed together, had sexual relations, were publicly affectionate, spent holidays together, and appeared to others to still be a couple.  As well, Ex-Husband did not advise Ex-Wife or his children of his intent to separate from Ex-Wife until February 2012.  On this record, we agree with the master that the parties separated in February 2012.  ***See generally Wellner, supra*** (holding court did not err in using August 1992 as

---

[5] In support of its position that Ex-Wife's statement in the support action constituted a judicial admission, the court relied on ***In re Schulz' Estate***, 392 Pa. 117, 139 A.2d 560 (1958).  Nevertheless, that case had nothing to do with judicial admissions and does not mention judicial admissions at all.  The only relevancy ***In re Schulz' Estate*** potentially has to the appeal before us is the Court's one sentence that: "The entire record of this estate, including the record before the various courts, was admitted into evidence and, even if it were not, we could take judicial notice therof."  ***Id.*** at 123, 139 A.2d at 563.  We do not agree with the court's extrapolation from this one sentence that simply because the court could take judicial notice of Ex-Wife's statement in the support complaint, such notice could convert her statement in that proceeding to a binding, judicial admission in the divorce proceeding before us.

date of parties' separation; although husband claimed parties separated in August 1979, when wife left marital home to care for her ailing father and did not return, court emphasized that neither party had affirmatively indicated their intent to live "separate and apart" until that time; even though parties had not been living together before then, they had still acted as if they were married, vacationed together, were physically intimate, and held themselves out as husband and wife).

The record further confirms that Ex-Husband met Ms. Jordan in January 2012, Ex-Husband invited Ms. Jordan to stay over at his apartment on the first night he met her, Ex-Husband admitted Ms. Jordan was his girlfriend by March 2012, Ms. Jordan kept numerous possessions in Ex-Husband's apartment in Amsterdam and appeared to be living there in March 2012, and Ms. Jordan wrote Ex-Husband cards which Ex-Wife discovered that showed their relationship was intimate. Although Ex-Husband claimed he did not engage in a sexual relationship with Ms. Jordan until May or June 2012—post separation—the master rejected this testimony in favor of the other circumstantial evidence showing that Ex-Husband and Ms. Jordan were having an extramarital affair. We see no reason to disturb the master's credibility determinations on this point. *See Brubaker v. Brubaker*, 201 A.3d 180, 184-85 (Pa.Super. 2018), *appeal denied*, 654 Pa. 506, 216 A.3d 225 (2019) (stating "that a master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of

credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties") (quoting **Carney v. Carney**, 167 A.2d 127, 131 (Pa.Super. 2017)). Given the evidence presented, we agree with the master that Ex-Husband began an affair with Ms. Jordan in January 2012 pre-separation, which continued post-separation. Therefore, Ex-Husband breached the terms of the "illicit acts" provision of the Agreement.

Turning to the "divorce" section of the Agreement, the record shows that Ex-Husband originally filed a divorce complaint on May 2, 2012. In February 2013, Ex-Husband withdrew that complaint. Accepting Ex-Wife's proffered meaning of the word "seek" as "to go in search of, look for, to strive for, try to get or obtain," the master concluded that Ex-Husband sought a divorce when he first filed it. The master noted that Ex-Husband still "sought" a divorce even after Ex-Wife filed the divorce complaint in March 2013 by continuing to participate in the process and expressing his desire to obtain a divorce. The master found Ex-Husband's withdrawal of the 2012 complaint irrelevant to the language of the Agreement, which imposed certain penalties upon Ex-Husband for seeking a divorce after the date of the Agreement. The court agreed with the master that Ex-Husband's withdrawal of the divorce complaint did not change the fact that Ex-Husband "sought" a divorce. (**See** Decision and Order at 18).

The court emphasized, however, that weeks prior to Ex-Husband's filing

of the divorce complaint, Ex-Wife's counsel sent a letter to Ex-Husband's counsel dated April 12, 2012, recognizing that Ex-Husband had wanted to move forward with a divorce and proposing that Ex-Husband initiate the divorce proceedings. Specifically, the letter from Ex-Wife's counsel to Ex-Husband's counsel stated:

> Please be advised that I have been retained to represent [Ex-Wife] in the above-referenced divorce matter**. It is my understanding that [Ex-Husband] has retained your office and desires to move forward with the divorce as soon as possible**. Therefore, I propose that [Ex-Husband] initiate the divorce action so that we can begin discussing a resolution of the parties' respective claims. I am willing to accept service of the divorce complaint on behalf of my client.
>
> In the meantime, should you have any questions, please feel free to contact me.

(**See** N.T. Hearing, 12/10/14, at 969 Ex D-34; R.R. at 1151) (emphasis added). The court decided that Ex-Wife's letter through counsel acted as a waiver of the "divorce" section of the Agreement, such that Ex-Husband's filing of the divorce complaint in May 2012 did not constitute a breach of the Agreement. (Decision and Order at 19).

We cannot agree with the court's analysis. Significantly, the language triggering the "divorce" section of the Agreement occurs if Ex-Husband "seeks" a divorce. The Agreement does not use the word "files" for divorce. We will not assume that the parties were ignorant of the meaning of the language they employed by substituting the word "files" for the word "seeks" in the Agreement or purporting to use those words interchangeably. **See**

***Ramalingam, supra***.  The record shows that Ex-Husband informed Ex-Wife and his children in February 2012, of his intent to separate from Ex-Wife and go forward with a divorce.  Ex-Husband subsequently retained a lawyer for that purpose, which Ex-Wife's counsel acknowledged in the April 12, 2012 letter.  Thus, Ex-Husband "sought" a divorce before he filed the divorce complaint in May 2012, and the letter from Ex-Wife's counsel to Ex-Husband's counsel does not bar her claim to relief.[6]

Based upon the foregoing, the record supports the master's findings that Ex-Husband committed "illicit acts" prior to the parties' separation in February 2012, and "sought" a divorce from Ex-Wife, such that the "illicit acts" and "divorce" sections of the parties' Agreement apply to this case.  Accordingly, we vacate the June 22, 2021 order and remand for further proceedings consistent with this memorandum.

Order vacated.  Case remanded for further proceedings.  Jurisdiction is relinquished.

_____

[6] We recognize the court's statement that the "divorce" section of the Agreement violates public policy considerations.  As this Court already decided the court erred by *sua sponte* questioning the validity of the Agreement where the parties had stipulated to same (***see Belke, supra***), we agree with Ex-Wife that the court once again improperly raised the validity of the Agreement, and we give this portion of the court's analysis no further attention.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/07/2022